Case number 19-2056, Gregory Ackerman et al. v. United States Department of Agriculture et al. Argument not to exceed 15 minutes per side. Mr. Gronzato, you may proceed for the appellant. Thank you. Mark Gronzato on behalf of the plaintiff's appellants. I'd like you to think of the case involving the illusory insurance and the great administrative mystery because that's what this case is about. The United States government, I didn't know until this case is involved in the business of crop insurance. But since 1980, the business of formulating such insurance has been left in private hands. And what's supposed to happen is that a private entity creates these policies of insurance. They are subject to supposedly rigorous administrative review. And if approved, they're then sold by private insurers. What's important in this case is that the indemnification provisions, I believe almost across the board in crop insurance, are predicated on two factors, two prices, one determined at the beginning of the crop season, projected price, and the other one determined at the end of the season, a harvest price. My understanding is that in most crops, the harvest price is in fact determined by a commodity exchange. And that's how it's done normally. It turns out that the dry bean insurance, the dry green crop, does not have a commodity exchange. So the private insurer, this is Watson Associates, that had to develop this policy, had to find some other way of determining harvest price. And what they decided upon was a publication of an arm of the USDA that does in fact publish prices based on data supplied to them. And from, I believe, September to November, the, this bean market news, sort of an arm of the USDA, was to accumulate data from producers of dry beans, and on that basis, establish a harvest price. The question, the major question in this case, for my clients, is what was to happen when that data was not available? Because the essence of this case involves what happened when the bean market news did not accumulate sufficient data to establish a harvest price. Now, there is no question, by the way, it's important to understand that the original formulation of this policy and the applied only to Minnesota and North Dakota. The following year, the same entity, Watson Associates, requested that this program be extended to Michigan, and it was in 2013. My clients bought crop insurance in 2015. There is no question that the policy that they purchased, talking about this default that exists where the bean market news did not accumulate sufficient data, there is no question that the policy that they purchased in 2015 says explicitly that if the bean market news does not accumulate sufficient data to establish a harvest price, then the harvest price would be set equal to the projected price, the price set at the beginning of the year. That's not subject to debate. That's the policy my clients purchased. The plaintiff in this case, just so you know, the end of the story is that my clients bought 2015 insurance, and the insurance proved to be illusory. It turned out to be a fantastic crop, but they needed protection based on price because the price had fallen so dramatically during the year. Mr. Granzato, can I ask you one question? That was a very helpful summary to lay away. Now, you mentioned that it's common ground that the default was the projected price in the contract. Is that something that your clients should have been able to see was a shortfall that in the event of the kind of oversupply they in fact had in 2015, you know, the projected price is probably going to be, I guess it would be higher than the harvest price, right? Yeah. But in any event, I mean, could they have foreseen the illusory quality if they had read the contract given their understanding? I don't think so, Judge, and the reason for it is quite simple, and that is it took a tremendous postmortem. The administrative record in this case is 15,000 pages long. A substantial percentage of that 15,000 pages is in fact a postmortem as to what happened. Why did this crop fail in 2015? And I think that if you look into that, you would see that even the experts were sort of flummoxed by the fact that this thing failed. But the key to this case is something that everybody involved in this case was working under a misapprehension as to the administrative record in the district court. The government, the district court, and I must admit my predecessors were working under a really serious misapprehension of the administrative record because my clients were arguing that the default should be that the USDA or one of its arms, the FCIC or the RMA, sets the client's position. It was largely formulated on the basis of a handbook that Watts was required to provide by federal regulation, which clearly specified that the default would be that the RMA or the FCIC, arms of the USDA, would in fact set the default price. Everybody in this case was working under one critical misapprehension of the relevant administrative record, and that is this. The original Watts proposal was made in 2011. They must, by federal regulation, present a copy of the policy that is in fact the one that they want the USDA and its arms to adopt. The fact is that what's unusual about this case is the policy that they had in the administrative record it was in fact something that said the default would be that the USDA or the FCIC would in fact set the hardest price. My clients argued that that's the way it should be. It turns out that the administrative record was the policy that was submitted that got approved. The 508H language, right? You're talking about the 508H policy submission. That's correct, that's correct. Had different language than for whatever reason is the language that the Minnesota farmers get when they buy the stuff, right? Well, it turns out this is another interesting fact about this case. Somehow we have learned now since the government filed its brief in this case that there's nothing in the administrative record as to what the Minnesota farmers purchased. What their policy said, but the actual the brief that the government has filed in this case goes outside the record to demonstrate that the farmers in Minnesota in 2012 purchased crop insurance that said something different than the only policy that was in front of the FCIC when this was approved. Policy that was submitted and it's in the administrative record four or five pages says explicitly that the default was that the FCIC would set harvest price. The policy it turns out that the Minnesota farmers bought apparently said it was the default was that the harvest price would equal the projected price. So in other words, the policy language, the price mechanism that was subject to expert review in connection with the Minnesota 508 H application was that the agency sets the harvest price, not that the harvest price is projected. Exactly right, and there are two very revealing emails in this case. One in February 2012, less than one month before approval, in which a Watts representative tells an RMA representative, no, no, no, you got it wrong. Because the RMA representative, if you're interested, starting on page ID 3111, it's an exchange between an RMA representative and somebody from Watts one month before this was approved, in which the RMA representative says a complete misunderstanding of the policy that's in front of it. Oh, we understand that the projected price will equal the harvest price if we can't get enough data from the B market news. And the person from from RMA, excuse me, from Watts says, no, no, no, the language in the submission, and this is page ID number 3118, the language in the submission regarding inability to determine the harvest price when the projected price has been determined is substantially the same as that of section 3C5 of 11-BR. That 11-BR is the common crop policy, which clearly everybody agrees has a default, which is that the RMA or the FCIC sets it. So one month before this policy is approved, the Watts associate person is correcting the RMA person, his misunderstanding that that is the default. And even worse for the government in this case, because what the government has suggested is there's some sort of mysterious goings on after the approval that ended up in the change that was imposed on the Minnesota farmers as early as 2012. Because they're suggesting that there's something that happened between that time. I can tell you, in 15,000 less than scintillating pages of this administrative record, there is nothing, nothing, nothing that supports the government's rather late suggestion here that something changed between the time of approval. And as I've noted in my reply brief, even if it did change, it was completely contrary to federal regulations. It was never considered by the expert, you know, review process. Exactly. Where the rubber hits the road for the APA. That's correct. This was not subject to the extensive expert review, precisely because it wasn't in the policy that was proposed. And this is a great mystery. The mystery in this case is how did this policy that had clearly a default, which is in my client's interest, suddenly morphed into a policy that's completely different. You know, this court has said that an administrative agent's decision is supposed to be discernible. And the fact is, this decision is sort of irrational and not discernible as to how this happened. I'll quit. No, I'm sorry. And just one second, one question. And in conjunction with that same argument, it's your position that there was a significant change here. And if the procedure relative to significant change had been followed, likelihood is this whole thing would have been discovered, or any discrepancies would have been discovered. Yes. And it's very important, just so you know, the regulations themselves define what is a significant change and what is a non-significant change. And there is no question that under the definition, I believe it's 7 CFR 400.701, the definitions of significant and non-significant, this was a significant change. Thank you. Thank you. All right, we'll hear from opposing counsel. Thank you, Your Honor. May it please the court, life overruled on behalf of the Federal Appellees. I would like to start before getting to the merits of the procedural objection the plaintiffs are now pressing here. First, with the common grounds, which is that no one disputes that the dry bean revenue endorsement that they purchased, and that was finalized even in the Minnesota and North Dakota case in 2012, included as a default contingency procedure when the primary mechanism that the policy established for determining a harvest price was unable to determine a harvest price. That is by reference to the bean market news, the contingency procedure in the policy that governs their contractual relationship with the insurers provided for the substitution of the projected price in that case. And then before, again, even getting to the merits. It's also common ground, Mr. Overbold, that the 508H submission in Minnesota did not include that language, correct? The, well, so the expansion proposal in 2013 did include that language. I'm talking, my question is the 508H language in Minnesota that was approved in March 2012, that did not include the language you just referred to with respect to the projected price being the default for the harvest price. Is that correct? The policy language in the 508H submission provided for the Federal Crop Insurance Corporation. Right, so it's a yes, right? Well, no, because if you do look at part five, section five of the submission, Watts did propose a methodology for how it would. That's not, I'm not asking if the agency should choose. I'm asking whether the 508H submission, which was required to include the policy language that would be part of the insurance contract, the language you just referred to. The 508H submission that was approved in March 2012 did not have the language you just mentioned. It did provide for the Federal Crop Insurance Corporation to set the price as a default. The point I just want to make is that the answer is yes, right? But that does not provide. It's a yes or no answer. It's an important question. Please give me a yes or no, and then we'll go from there. I understand, your honor. You are correct that the policy language did provide for the corporation to set the price as a contingency. The point I just want to make is that that does not establish a mechanism for establishing the price in the event the primary mechanism fails. The mechanism, I guess, you know, as an outsider looking at this, the mechanism would seem to be that the agency uses its expertise to determine as best it can a harvest price. I mean, this is the sort of thing where an agency actually has expertise. Well, why is this in the basic policy, the exact same language, if this is just some cipher that means nothing? Well, the difficulty we have here, and this is why revenue insurance has not generally been offered for these type of dry bean crops for a number of years, is that you do not have the sort of commodity market trading that has traditionally been used to determine both the difficulty of establishing a harvest price is something that Watts, as the private party proposing this insurance policy, had to address in determining whether revenue insurance could be provided because it does provide a value to farmers to be able to hedge against this risk. But you have a difficulty in establishing that where you don't have commodity markets. It is not something where you- I guess everybody knows that in 2015, the harvest price was way below the projected price, right? Because the supply was so great, the crop was so great that year, right? I'm not sure there is any reliable way anyone has identified what the actual harvest price would have been. It is true that the AFTR reports reflect that the market had become illiquid for large parts of the harvest season, which did then result in the bean market news mechanism failing as a primary mechanism to establish the harvest price. I understand your point about the difficulty of getting price data from these crops. I think you- I think the government covered that in its brief with respect to how, I guess, beans aren't traded on the commodity market, so you don't have that usual data, and now you have to round it up from the bean market news. But the agency's role in this insurance program, as I understand it, I just want to, you know, since you know more than I do, I want to make sure I've got it right, is to review these things to make sure that this is going to be a sound insurance policy that has competent price mechanisms, isn't going to defraud the farmers somehow, and that this is a product that, you know, within reasonable limits, the farmers can rely upon. Is that fair? That is fair. I mean, the agency reviews to make sure it adequately protects the interests of the producers, that it otherwise complies with the statute. I mean, it is in a process in which, you know, if the agency does not act, the policy is deemed approved. There is a specific temporary time limit for agencies, actually, and there is nothing unusual, as in this case, about it approving while delegating to the manager the authority to make the sort of changes that might be needed to make the policy sufficient and something that can be sold to producers. And that is what happened in this case. There is no sort of central mystery, what we have in the record. Well, look, before we move on to mysteries and so on, I mean, so the agency's role is to protect the farmers, to make sure these insurance policies are the kinds of things I've described. And to that end, because sometimes, you know, these pricing mechanisms involve, you know, complicated questions. So the agency has expert review of the pricing mechanism, particularly this one, because we're going into uncharted territory outside of the commodities market. And I guess the core problem, and I'll just put it on the table for you, the core problem I have with the government's position here is that that whole process seems to have failed. And it's failed for the reason that the very price mechanism that is, as you point out, in the Michigan Bean DRBE, that endorsement, that very price mechanism that says harvest price is projected price if we can't get the price data from the bean market news, that mechanism, so far as I can tell in this administrative record, has never been subject to review and consideration by the agency. Somehow, it got in the Minnesota policies after the agency's approval, without the agency knowing it, and then the agency apparently doesn't notice that this change is being carried over into the Michigan policy. And so this price mechanism, which has, understandably, I mean, which these farmers are understandably really upset about, this price mechanism never got reviewed by the agency. And so the whole process failed. Maybe I'm wrong in some of that, but I don't see how I am. And I just candidly want to give you a chance to tell me where that's wrong. Sure. I do not think that is correct, that the default mechanism was not reviewed. And in particular, it's the Acacia group was one of the two experts that raised concerns about the primary mechanism for establishing the price, that there is some possibility the bean market news mechanism would fail. And it recognized in that situation, you would substitute the projected price. Is this something, is this like in the expert emails back and forth kind of comment period in Minnesota? No, this is in the, I apologize, your honor, I should have the slide at hand. It is on page 3176 of the record. Okay. And what is this? Is this part of the Michigan application? This is part of the Michigan application. The Acacia group is one of the experts that reviewed, this is in January, 2012. They reviewed- That would have been Minnesota, right? Michigan application just got waived. Yeah, I apologize, Minnesota- You don't even have to stop, just go ahead. Yes, this was in the original submission. They recognized that there was some possibility that AMS mechanism would fail. And in the extreme case where it failed to report for three months, the harvest price would be equal to the projected price and the revenue insurance product would revert to yield insurance products. Okay, so that's one exchange with one expert who's reviewing the proposed 508 language. But as Mr. Granzato points out, there's an email a month later where I think the agency itself said, what do we do if we don't, are we going to be doing projected prices, harvest price if we can't get the data? And Watts, the proponent of this whole thing, Watts says, no, no, no, no, no, no, no. The agency is going to set the price. It's not just going to be this mechanical default. And meanwhile, I mean, nothing that you described in that email exchange shows up in the policy. There's nothing in there that shows that the agency approved the idea that whether the contract says it or the agency always decides this way that the harvest price is the projected price. I just, there's no reason consideration by the agency of that pricing mechanism. There's one fragmentary email is all there seems to be. Well, this was the, I take the point that in the 508 submission, in the 2012 508 submission, not the 2013 one, which is actually the relevant agency decision for this case. But in the 2012 decision, there was the provision that the FCIC would set the price with no indication how they would do it, what the mechanism was. The only pricing mechanism reflected in the report is Watts' suggestion that if you don't have an AMS report, you substitute the projected price. So that was the mechanism considered. That was all- Why wouldn't we, I mean, these are expert agencies. I mean, they're here because they're experts in these sorts of judgments as opposed to, well, I'm not going to go down that road. They're experts in this sort of thing. And if we see the expert agency will set the price, why shouldn't we read that to mean, okay, so the agency's going to use its expert judgment and pick a number? I think in this particular situation, where you also had the risk management agency comments in January, 2012, that's also in the setting, putting responsibility on the corporation is improper because it transfers responsibility that under the regulations, it is ultimately the private party proposing this policy that has to, this is a difficult situation where it is important to have revenue insurance, if it can be provided. Farmers are at a competitive disadvantage when they don't have that revenue insurance. Everyone agrees it is hard to determine what the harvest price is, particularly in situations like we had in 2015. And it is the private party that is proposing a mechanism to solve that problem. The risk management agency, I think, fairly said that you cannot just kind of punt the issue in a situation where the primary mechanism fails. And that was all before the commission, when it approved the policy while again, delegating to the manager to make the necessary changes to actually put it out for sale. And I would, just before my time expires, there are two threshold problems for the plaintiffs, before you even get to the consideration of this procedural objection on the merits, one of which is, you know, they made two entirely different arguments in district courts, they have not really indicated why, even if this court has discretion to consider an argument that was forfeited in district court, it should, this is certainly not a question. I mean, the government quoted the wrong language in the district court, the government told the district court that the 508H submission in Minnesota said something it didn't say. The idea that these farmers who really, you know, whether the law has a remedy or not, these farmers really got a terrible deal here. The idea that they can't make this argument now, because they didn't catch the government's mistake soon enough, when the government itself never caught it. And I mean, the government, in this case, made the same mistake that the board itself made in 2015. They didn't realize this language was in the proposal. So I mean, speaking only for myself, the idea that we're going to refuse to hear this argument based on the government's you know, that just doesn't seem to get anywhere. I would then just add as well that the policy we have it here was approved by the board in this form in the 2013 submission. And if I can finish out any reasoning, because it was deemed a non significant change. Well, but I think in the record, you see the reasoning for why the they believe that the primary mechanism would would have been Minnesota and North Dakota. At the time it was approved, it is a little the notion that that is then that, you know, we can reach back year after year and find one procedural problem. procedural problem, the length, the price mechanism was never approved. I mean, you know, the agency's got to do better than this. I mean, you've got to, they've got to consider the to say, Oh, there's some email that makes a reference to it, notwithstanding that it's contradicted by another email. And the Michigan, the board with respect to the Michigan proposal, as Judge Guy points out, I mean, it just didn't see that the language was different. And I'm not saying it was, you know, bad intent or anything, but the system failed. So far as I can tell, I would just add that I do think the entirety of the 508 age submission, the expert reports that were provided to the board in connection with it do reflect consideration, both of the risks that the primary mechanism might fail, that was the focus of the agency's consideration, because that is the one mechanism that had been identified to absent some other default mechanism, you know, you cannot provide revenue insurance, absent an identified method of determining the purpose price. All right, well, thanks for putting up with all my questions. Yes, we can hear rebuttal. There is rebuttal. You're muted. I'm sorry. But technically disoriented. I don't have much to add, Judge Kaplan, you are absolutely correct with respect to this. And the reasoning in this case has to be under the standards of this court in the Atrium case, discernible and defensible. And this is a situation where there's no defense for what happened here. None. The fact is that the they never considered this. It was never considered at the agency level. Something changed. There's some great mystery occurred in this case to change this, because even understand that even after it was approved, there was there were transmissions between the agency and Watts, confirming the fact that Watts was again, making it very clear that the fact is that this was that the RMA was to determine the harvest. And the that's your Granzato. Can I ask you a question about that? Yes. I mean, how do you think they they would do it? You know, I mean, let's let's say, I mean, how would they do it without the bean market news? Do you have a sense of that? Or I mean, it's really not necessarily. Well, I'll just let you answer. I have no idea how they would do it. But the fact is that the default that was actually in the proposal, the default, by the way, I was referring to something that occurred after the approval, because even after the approval, you'll see that there was, in fact, a reiteration by Watts, the, you know, the formulator of this, there was a reiteration of the fact that this was going to be determined by the federal agency, not not by going to harvest price, equaling the projected price. So even after the fact, there was a confirmation of that. And yet, somehow, this great mystery that's developed in this case, how did the policy that ultimately get issued even in Minnesota and North Dakota? How did that policy end up being what it was? Because you're saying even after 508 H approval in March, correct. And what you're referring to in the record when you say there's this after the fact confirmation, page ID number 3508 is a communication between the person from the RNA and somebody from Watts and page for 3508 3509. And this is again, I want to make sure I have the date right. I can look, we'll look at 27, March 27 of 2012, which is about a month after approval. And in that in that email exchange, the with regard to your question regarding how RMA is to determine a harvest price that's contained in the crop, what's contained in these crop provisions is identical to the language contained in the basic provisions again, I got a policy. So even after, after the approval, it's still there's still communication between Watts and the federal agency confirming the fact that this is in fact, going to be determined by the agency. Now, the great mystery in this case is what happened. We don't know. We just don't know. And I take it that if you were to prevail today, this would probably have to go back to the district court. Among other things, there was a couple of alternative remedies proposed. Yes. Well, I think, I think this is for the reason Judge Ketledge outlined in his question. I don't know if this is a case that has to go, but it seems to me that there was a complete failure. And I'm sorry that we did not tell the district court exactly why this was a complete failure. Counsel, I know you're out of time, but just one last question here. I know you say that everybody misapprehended the record, but the district court can only arrive at his ruling based on the record that's provided. In your view, what were the specific errors made by the district court and arriving at his ruling to grant summary judgment in favor of defendants here? Well, the basic error was that the district court operated under the assumption that what was contained on pages six and seven of the government's brief of the defendant's brief was in fact accurate. And that proved to be completely untrue. And it's a pretty astounding bit of whimsy, if you will, as to how this case was presented by the defendants, the federal defendants, because on page six of their brief, they actually identified the correct policy, the correct pages of the administrative record. And it happened to be pages 2923 to 2927. This is on page six of their brief. And then you move to the next page. Remember 2923 to 927. They quote in their brief on the following page from page 2298, not 2923 to 2927. They quote pages 2298, and they even accented the harvest price will be equal to the projected price. That's what they presented to the trial court. Now, it looks like they're referring to the same thing, but they're not. I'm a little suspicious of what went on here. But the fact is that the pages six and seven, the brief that they filed in the motion for summary disposition, they correctly identify on page six, the policy that did in fact say that the federal defendants would as default set the price. One page later, they cite from a completely different place in the administrative record. And it said the harvest price will be equal to the projected price. Not true. Not true. All right. Okay, thank you. No further questions than the case. The case is submitted.